UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL CHAIDEZ,

    Petitioner,

v.

NEIL MCDOWELL,

    Respondent.

Case No. 15-cv-03367-WHO (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner Miguel Chaidez seeks federal habeas relief from his state convictions because (1) his confession was coerced and involuntary; (2) the admission of prejudicial and irrelevant evidence violated his right to a fair trial; (3) he was denied his right to confrontation; and (4) there was cumulative error. None of these claims has merit and, for the reasons set forth below, the petition for habeas relief is DENIED.

## BACKGROUND

In March 2008, Chaidez participated in the murder-for-hire plot to kill Mark Achilli, his co-defendant Garcia's rival for the affections of Tessa Donnelly. Achilli was found shot to death in the carport of his residence. Evidence linking Chaidez to the murder

included (1) the testimony of his cousin Daniel Chaidez,[1] who acted as negotiator and courier between Chaidez and Garcia; (2) a record of telephone calls between the participants in the weeks before, and on, the day of the murder; (3) records of money transfers from Garcia to Daniel, and from Daniel to Chaidez, e.g., a moneygram receipt of a $2,500 wire transfer from Daniel to Chaidez was found in Chaidez's vehicle; (4) the same photograph of Achilli was found on Daniel's computer and on Chaidez's; and (5) Chaidez's confession to police:

> [After being read his *Miranda* rights,] Miguel said that his cousin Daniel called him in February 2008 and asked him if he could arrange to have someone 'taken care of.' Miguel said that he understood this to mean to kill someone. Miguel said that he and Daniel agreed on a price of $9,500. Later, Daniel told Miguel how to access a Web site with a photograph of Achilli. Miguel said he found the photograph of Achilli which had a 180 logo on it. Miguel printed out the photograph and gave it to someone he knew. Miguel said he got a wire transfer of $2,500 before the murder. On March 13 he met someone and gave him $1,500 cash, the victim's photograph, and the victim's address on Overlook Drive. Miguel said he met with Daniel on March 15 and Daniel gave him $6,500 cash. Miguel said he drove back to Southern California. Miguel wrote a confession on March 28, 2008. In his confession he wrote, 'I called Dan to let him know right after.' Miguel told police that Daniel put a maximum price of $10,000 for the murder. Miguel said that 'tak[ing] care of' someone meant killing someone.

(Ans., Ex. 6 at 26 (State Appellate Opinion, *People v. Garcia, et al.*, No. H036346, 2015 WL 917801 (Cal. Ct. App. Mar. 20, 2015) (unpublished)).)

In 2010, a Santa Clara County Superior Court jury found Chaidez, who was tried with co-defendants Esequiel Paul Garcia and Lucio Estrada, guilty of first degree murder.[2] In 2011, he was sentenced to twenty-five years in state prison. (*Id.* at 1-2.) Chaidez's efforts to overturn his conviction in state court were unsuccessful. This federal habeas petition followed.

---

[1] To avoid confusion he will be called Daniel throughout.
[2] The jury determined that Estrada was the shooter. (Ans., Ex. 6 at 1-2.)

**STANDARD OF REVIEW**

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. *See Delgado v.*

*Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review is not a *de novo* review of the constitutional issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

## DISCUSSION

### I.   Voluntariness of Chaidez's Confession

Chaidez alleges that his confession was involuntary because of the lengthy delay between arrest and interrogation, his tiredness, and his concern about his brother Cesar, who was also in police custody. He asserts that the trial court's denial of his motion to suppress his confession violated his Fifth Amendment rights. (Pet. at 6, 10.)

The relevant facts are as follows. The police arrested Chaidez and his brother Cesar at 8:46am in Los Angeles in March 2008 and took them to the local police department:

> Miguel was kept in a holding cell at the police station in a white paper suit and paper slippers until approximately 3:00 p.m. During this time he was fed. Two officers put Miguel in waist chains and brought him back to the Santa Clara Police Department in a vehicle. At the time, Miguel was barefoot and wore shorts and a tank top.
>
> During the four-and-a-half-hour trip from Los Angeles County to Santa Clara, the officers did not tell Miguel why he had been arrested and did not talk about the case at all. They may have said that his name had come up during a homicide investigation. Miguel sat in the front seat of the car and again was fed during the trip. The officers did not read Miguel his Miranda rights and did not question him about the case; Sergeant Frisby had specifically instructed them not to ask any questions.
>
> When they arrived at the Santa Clara Police Department at about 7:30 p.m., the officer turned Miguel over to Sergeant Frisby and Detective Wahid Kazem. At the very beginning of the interview, after Miguel was read his Miranda rights, Sergeant Frisby asked if Miguel had any questions and Miguel asked if the officers knew what had happened to his brother; Miguel was concerned about his brother's welfare. When Miguel expressed his

4

concern about Cesar, the officers told him that 'Cesar had been cooperative' and that he was 'okay.' One officer told him that what he had to say 'may clear some things up with Cesar.' Miguel proceeded to tell the officers about his involvement in the murder.

Miguel testified that he and his brother were taken in separate police cars to the Monrovia police station and that was the last he saw of him. When Sergeant Frisby and Detective Wahid took him out of the holding cell, he saw his cousin Daniel in another cell. The officers told him that Daniel had 'been real helpful.'

Miguel said that his brother Cesar was only nine months younger than he was, but he did not mature as fast; Miguel had 'kind of like a parental feeling' toward Cesar. Miguel testified that he had 'more than a brotherly relationship with [his] brother' and had 'a bit of a hand in his upbringing'; further, being the older one his 'first instinct [was] always . . . to protect him.

According to Miguel, at the time of his interrogation he was really tired. He had been up for about 36 hours without sleep. He had used 'crystal meth' to stay awake because he had gone to school the previous day from 3:00 p.m. to 2:00 a.m. Miguel said that he had never been arrested before. If his brother had not been in custody and the police had not told him, in essence, that he could clear things up for his brother, he probably would not have made any statements. Miguel acknowledged that he was read and understood his *Miranda* rights; he testified that he voluntarily spoke to the police after they advised him of his rights.

Miguel argues that he was 'concerned about the wellbeing of his younger brother, Cesar, [whom] he had last seen when the two were on the ground, held at gunpoint and arrested by the police at a gas station hundreds of miles from where [he] was later that day taken and interrogated.' Further, he testified that 'his relationship with his [*sic*] Cesar was more than that of a brother but rather that of a protector and almost father.' Miguel asserts that under the totality of the circumstances test, including the lengthy delay between arrest and interrogation, his confession was involuntary.

(Ans., Ex. 6 at 50-52.)

The state appellate court rejected his claim because Chaidez was "an adult who . . . understood the officer's *Miranda* warning, but elected to voluntarily speak with them":

In this case, the undisputed evidence establishes that over the course of the interrogation, whether measured from the time of his arrest at 8:46 a.m., or

5

>the time the interrogation began approximately 10 hours later, Miguel was given food and drink; and he had the opportunity to use the restroom and rest in the holding cell for approximately five hours before he was transported. During the trip to Santa Clara, Miguel was again fed and was seated in the front seat of the car and was chatting to the officers about football and sports. Undoubtedly Miguel was stressed and tired, but the record does not establish that either the length or circumstances of the interrogation were so severe as to render his admissions involuntary. Miguel did not indicate that he was tired or hungry or wished to use the restroom and was told that he could not. Miguel's interrogation 'was not accompanied by a denial of all creature comforts or accomplished by means of physical or psychological mistreatment, threats of harsh consequences or official inducement amounting to coercion....' [citation omitted].
>
>The questioning was not aggressive or confrontational; and the officers did not threaten to arrest another family member or to release a family member if Miguel gave a statement. The fact that Miguel asked about Cesar and the officers agreed to update him on his brother's situation does not alter our conclusion that Miguel's confession was voluntary. The police did not deceive Miguel in an attempt to gain a confession. Their assurances that Cesar had been cooperative and was 'okay' and that Miguel could 'clear some things up with Cesar' were not 'of a type reasonably likely to procure an untrue statement.' [Citations and internal quotation marks omitted.]
>
>Further, Miguel's claim of psychological coercion is rebutted by his testimony at the section 402 hearing that he voluntarily spoke to the officers. While it is apparent that initially Miguel was concerned about his brother, nothing in the officers' words or actions suggested that they would release Cesar only if Miguel confessed to being involved in the murder of Achilli. We see no connection between Miguel's inquiry about his brother and Miguel's subsequent confession. The officers never stated or implied that a statement from Miguel confessing to the murder would cause them to free Cesar.

(Ans., Ex. 6 at 53-54.)

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Absent police misconduct causally related to the confession, there is no basis for concluding that a

6

confession was involuntary in violation of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989).

To determine the voluntariness of a confession, the Court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). The Court then asks whether the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).

In determining whether the defendant's will was overborne by the circumstances surrounding the giving of the confession, the inquiry "takes into consideration . . . both the characteristics of the accused and the details of the interrogation." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The pivotal question in cases involving psychological coercion "is whether [,in light of the totality of the circumstances,] the defendant's will was overborne when the defendant confessed." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993). More specifically, courts consider the following factors: the age of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). The interrogation techniques of the officer must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Moran v. Burbine*, 475 U.S. 412, 433-434 (1986).

Habeas relief is not warranted here. The techniques used by the police do not shock the conscience, nor do the circumstances of the interrogation show coercion or that Chaidez's will was overborne. Though there was a lengthy delay between arrest and

7

1    interrogation, nothing indicates that the delay was used to coerce Chaidez. (Rather it was
2    to bring him to the proper jurisdiction for questioning.) In fact, during the long drive, he
3    was fed and chatted amiably with officers, who were forbidden to interrogate him about
4    the crime. Also, he was allowed to rest for five hours before being transported.

Nor is there evidence that the officers used Cesar as an inducement or a threat, or that the interrogation was aggressive. Indeed, Chaidez admitted in court that he voluntarily spoke to police.

In sum, Chaidez is a sane adult of apparently normal intelligence, who was fed, allowed to rest and to use the bathroom. He was informed of (and understood) his constitutional rights prior to questioning, admitted he voluntarily spoke with police, was subjected to a reasonable interrogation, and was reassured that his brother, about whom he had expressed anxious concern, was "okay."

In addition, there was no prejudice to Chaidez. The evidence against him was strong: Daniel's testimony, corroborated by bank, telephone, and computer records, provided highly inculpatory evidence of Chaidez's guilt.

The state court's rejection of his claim on these facts was reasonable and is therefore entitled to AEDPA deference. The claim is DENIED.

## II.     Admission of Evidence

The trial court admitted evidence that guns were found at Estrada's residence and at Chaidez's.[3] Chaidez claims that because these guns were not used in the crime, the evidence was irrelevant and prejudicial. He asserts that its admission violated his due process right to a fair trial. (Pet. at 6, 12.)

Defense counsel made a belated objection to the gun evidence the day after it was presented, which the trial court denied. The parties later stipulated that the court would instruct the jury to disregard the testimony about guns recovered from Chaidez's house.

---

[3] "The police officer who searched Miguel's residence . . . testified that he seized an SKS rifle, a casing from a .9mm bullet, and an Airsoft replica gun and an article related to a gang-related shooting from the residence. In addition, officers seized three .45–caliber handguns from Estrada's residence." (Ans., Ex. 6 at 57.)

1  The court did so: "Ladies and Gentleman of the Jury, you are not to consider the rifle and
2  pellet gun seized from [Chaidez's residence] because those items are not relevant to the
3  charges against the defendants in this case or any other case." (Ans., Ex. 6 at 58; Ex. 2,
4  Vol. 16 at 2556-57.) The state appellate court found that the instruction adequately
5  protected Chaidez's constitutional rights, and rejected his claim regarding the admission of
6  the gun evidence. (Ans., Ex. 6 at 58.)

Habeas relief is not warranted here. This Court must presume that the jurors followed the instructions and disregarded the gun testimony. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Moreover, there was no prejudice, owing to the strength of the evidence, which was described above and includes Chaidez's voluntary confession. *See Rupe v. Wood*, 93 F.3d 1434, 1444 (9th Cir. 1996) (prosecutor's improper reference to defendant's extensive gun collection did not violate due process because the testimony was short and did not describe the guns beyond naming them, and the other evidence against defendant was weighty). Further, Chaidez has no standing to object to the testimony regarding the guns found at *Estrada's* house. That evidence is connected only to Estrada, not Chaidez. Finally, even if the evidence were prejudicial, the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).

The state appellate court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

### III. Confrontation Clause Claim

Achilli's autopsy was performed by Dr. Happy, who also wrote the consequent report. Happy was unavailable to testify at trial, but Dr. O'Hara testified regarding the autopsy report and the findings it contained. When asked about the cause of death, O'Hara testified "Dr. Happy phrased it as gunshot wounds of the head and torso." (Ans., Ex. 6 at 49.) Chaidez claims his Confrontation Clause rights were violated because he could not cross-examine Happy regarding this statement. (Pet. at 6.)

9

Because the cause of Achilli's death was not in dispute, the state appellate court found any Confrontation Clause error harmless, and rejected this claim:

> The problem in this case is that although Dr. O'Hara testified to autopsy statements that simply recorded anatomical and physiological observations, when asked what was the cause of Achilli's death, Dr. O'Hara recounted that "Dr. Happy phrased it as gunshot wounds of the head and torso." In other words, Dr. O'Hara was testifying to a statement regarding the autopsy physician's expert conclusion as to the cause of death. Nevertheless, we need not decide whether Dr. Happy's cause of death conclusion was testimonial in nature because even if we assume error in the admission of Dr. O'Hara's statement as to Dr. Happy's conclusion as to the cause of death, any error was harmless beyond a reasonable doubt. There was no dispute as to Dr. Happy's cause of death opinion.

(Ans., Ex. 6 at 49.)

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *See Crawford v. Washington*, 541 U.S. 36, 51 (2004). Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior opportunity to cross-examine the witnesses. *Id.* at 59. While the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, it has said that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. Police testimony describing or outlining statements from a witness in lieu of the witness's live testimony also constitutes a testimonial statement. *Ocampo v. Vail*, 649 F.3d 1098, 1108-10 (9th Cir. 2011).

Whether an autopsy report is testimonial hearsay is not clear. At times, the Supreme Court has found lab reports to be testimonial, *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009) (a sworn certificate from a lab analyst identifying a controlled substance was deemed testimonial hearsay because it was the functional equivalent of in-court testimony); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 664 (2011) (certificate from a lab analyst regarding a blood alcohol test which was

10

introduced at trial by an analyst who did not perform the test was sufficiently "formalized" to constitute testimonial evidence), and at other times not, *see Williams v. Illinois*, 132 S. Ct. 2221, 2235-2244 (2012) (a plurality of the justices held that expert's reliance on an outside lab report to inform his testimony whether the defendant's DNA profile matched that of the perpetrator did not implicate the Confrontation Clause). In *Williams*, at least one justice acknowledged the confusion: "The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after *Crawford*, Confrontation Clause 'testimonial statement' requirements apply to crime laboratory reports. Nor can I find a general answer in *Melendez–Diaz* or *Bullcoming*." (*Id.* at 2248) (Breyer, J., concurring.)

The use of <u>autopsy</u> reports, according to Justice Breyer's concurrence in *Williams*, do not implicate the Confrontation Clause:

> [T]o bar admission of the out-of-court records at issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial. Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial?

(*Id.* at 2248.)

Confrontation Clause claims are subject to harmless error analysis. *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Habeas relief is not warranted here. First, although it is a close call, I agree with

11

Justice Breyer that an autopsy report is generally not testimonial hearsay, and was not in the context of this case. Testimonial hearsay, when one adopts a general definition, are those statements that were made in court (e.g., preliminary hearing testimony), or a statement likely to be used at a criminal proceeding (e.g., the sworn certificate as "functional equivalent" of testimony in *Melendez-Diaz*, or statements of witnesses to police officers). Autopsy reports, such as the one at issue here, are made to announce the cause of death "whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial." *Williams*, 132 S. Ct. at 2248 (Breyer, J., concurring). As such, the autopsy report does not constitute testimonial hearsay. Its introduction and use at trial did not implicate Chaidez's Confrontation Clause rights.

But even if that conclusion is wrong, any error was harmless. The cause of Achilli's death --- mortal gunshot wounds --- was not in dispute. And, as I have repeated before, the evidence against Chaidez was strong: Daniel's testimony, corroborated by bank, telephone, and computer records, provided highly inculpatory evidence of Chaidez's guilt, as did Chaidez's confession. The state appellate court's rejection of this claim was reasonable and is entitled to AEDPA deference. The claim is DENIED.

## IV.     Cumulative Error

Chaidez claims that even if the errors individually do not justify relief, the cumulative effect of them resulted in a fundamentally unfair trial. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

Habeas relief is not warranted here. The one possible error, the admission of the autopsy report when the author was unavailable for cross-examination, was found to be harmless. Because Chaidez has not shown any other errors, there can be no cumulative

12

error.

## CONCLUSION

The state court's adjudication of Chaidez's claims did not result in decisions that were contrary to, or involved an unreasonable application of, clearly established federal law, nor did they result in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Chaidez may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

**Dated:** May 13, 2016



WILLIAM H. ORRICK
United States District Judge